## BARNES v. MARTIN.

(Supreme Court, Equity Term, Monroe County. October 25, 1913.)

1. WATERS AND WATER COURSES (§ 154*)—CONVEYANCE—APPURTENANCES.

   Water privileges appurtenant to a gristmill property and necessary to its use pass by a deed of such property and "all and singular, the tenements, hereditaments and appurtenances thereto belonging or in any wise pertaining."

   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 167–173; Dec. Dig. § 154.*]

2. WATERS AND WATER COURSES (§ 156*)—WATER PRIVILEGES—IRREVOCABLE EASEMENT.

   H. owning a dam across a creek, the land at either end, and the millpond, having by deed conveyed to B. the right to construct and maintain a raceway on the east side of the creek through the lands of H., and also certain water privileges so that B. could take water from the pond and run it through such race course to a gristmill to be placed by B. on her land, and by the deed provided that each should make and keep a certain part of the dam in good and constant repair, B. the east part, and H. the west part, and that B. might raise the water in the pond a foot higher than it was, the water privileges so referred to constituted an irrevocable easement.

   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 158, 174–183; Dec. Dig. § 156.*]

3. WATERS AND WATER COURSES (§ 156*)—WATER PRIVILEGE—EASEMENTS.

   Where plaintiff, having the absolute right by deed to draw water from a millpond to her mill on the east side of a creek, and to maintain the dam where it then was, on rebuilding it, changed the location of its western end, at request of the owner of the land there, and for its benefit, and maintained it, as rebuilt, for 25 years, without objection, plaintiff's rights in the dam did not rest on a parol license, but the transaction was not only a grant of an easement, but constituted also an easement by prescription to have the dam located where it was rebuilt.

   [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 158, 174–183; Dec. Dig. § 156.*]

4. VENDOR AND PURCHASER (§ 231*)—NOTICE—RECORDS.

   A purchaser of land at the west of a dam, whose deed after describing the property refers to a map on file in the county clerk's office, indicating the dam, is put on inquiry as to what rights one having a mill on the east side has through their common source of title in the water privilege and to have the west end of the dam abut against his property.

   [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 43, 55, 487, 513–539; Dec. Dig. § 231.*]

Action by Charles P. Barnes against Richard P. Martin for an injunction and damages. Judgment for plaintiff.

Smith & Hebbard, of Rochester (P. Chamberlain, of Rochester, of counsel), for plaintiff.

Edward Lynn, of Rochester, for defendant.

CLARK, J. In June, 1825, Enos Blossom and wife deeded to Isaac Barnes a one half interest in a gristmill property, located on the west side of Allen's creek in the town of Brighton, Monroe county, and in 1837 Marshfield Parsons became the owner of the other half of this gristmill property. At that time, a short distance south of the grist-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mill and on the same side of the creek, there was located a sawmill owned by Enos Blossom, and that ultimately became the property of Benjamin Huntington.

Some years after 1825, when Isaac Barnes became the owner of a half interest in the gristmill property, he became the owner of the other half interest, and on the 20th day of June, 1853, he conveyed it all to Hannah Maria Barnes, the mother of this plaintiff. At this time and for many years previously there had been several different mills located on the west side of Allen's creek, near the Penfield road, so called, but there were no mills and there was no raceway on the east side.

The Huntington sawmill above referred to was located on the west side of the creek and south of the Penfield road, and there was a stone dam at that point extending diagonally across the creek, and water from the pond formed by this dam furnished power for the Huntington sawmill and the Barnes gristmill located just north of it, and in times of high water the surrounding lands on the west side of Allen's creek were flooded.

On June 20, 1853, Isaac Barnes conveyed the old gristmill property above mentioned to Hannah Maria Barnes, and she in turn conveyed it the same day to Benjamin Huntington, she, however, reserving the old gristmill and the right to remove it, and it was subsequently taken down and moved to her lot, at a point on the east side of the creek and north of the Penfield road, where it is now located. On the same day Benjamin Huntington conveyed to Hannah Maria Barnes certain lands lying about the old factory, so called, north of the Penfield road and west of the creek, and he also conveyed to her the right to construct and maintain a raceway on the east side of the creek extending in a northerly direction to the limit of his lands that lay on the east side of the creek, and in that deed to Mrs. Barnes he conveyed certain water privileges so that she could take water from the pond formed by this old dam and run it through the raceway to be built by her, through Huntington's land on the east side of the creek, to the gristmill, which she had reserved and which she was about to move to her lands lying on the east side of the creek and just north of the Penfield road.

This deed from Huntington to Mrs. Barnes also provided that each party was to make and keep his part of the dam in good and constant repair forever, and it provided that Mrs. Barnes should have the right to raise the water in the pond one foot higher than it then was, and in that deed it was pointed out which parts of the dam each party was to maintain, Mrs. Barnes to maintain the easterly part and Mr. Huntington the westerly half, and it further provided that Mrs. Barnes, the second party to the deed, was not to put up a sawmill on the west side of the creek.

So by these various deeds it will be seen that Benjamin Huntington became the owner of the lands on the west side of Allen's creek south of the Penfield road, Mrs. Barnes having conveyed to him her interest therein, but reserving the gristmill building which she subsequently

removed to her property on the east side of the creek, as above stated, and after she had thus removed it, and dug her race on Huntington's land located on the east side of the creek, as permitted by his deed to her June 20, 1853, Mrs. Barnes continued to occupy and run said gristmill until 1881, when she sold all of her property in that vicinity to the plaintiff, and he has continued to own it and conduct the mill up to January 14, 1912, and during all of that time the water furnishing the power for the mill was conveyed to it through this raceway above mentioned located on the east side of the creek.

It will be understood that, when Mr. Huntington gave Mrs. Barnes permission to construct this raceway on the east side of the creek, he owned the lands adjacent to the easterly end of the dam, and they extended northerly to the Penfield road, and by Mrs. Barnes' deed of the same date to Mr. Huntington she conveyed to him all her interest in the lands on the west side of the creek, so Mr. Huntington at that time owned the lands on both sides of the creek at the point where this dam was located, the westerly end of it being right near the sawmill, and the dam extending diagonally across the stream touching Huntington's lands on the east, and by his deed to Mrs. Barnes that day executed, he conveyed to her this privilege of constructing a raceway on his lands adjacent to this dam, and located on the east side of the creek and the right to take water from the pond formed by the dam, and convey it to her gristmill about to be removed to her land lying on the east side of the creek and north of the Penfield road.

After these transactions of February 20, 1853, by which deeds were interchanged, all being based upon valuable considerations, Mr. Huntington became the owner of all the land at that point on the west side of the creek, and by various conveyances these lands were transferred from Huntington through William M. Parsons to Lucas Seitz, Jr., and in August, 1911, his heirs conveyed it to the defendant, so that at that time defendant became the owner of the lands lying on the west side of the creek at that point which Benjamin Huntington acquired in June, 1853.

After these transfers in 1853, the dam on several occasions became out of repair, and temporary cofferdams were constructed for the purpose of changing the course of the water, so as to do less damage to surrounding property, and finally on or about the year 1885 or 1886, the old sawmill dam, which was in existence when the interchange of deeds was made, June 20, 1853, had gotten very much out of repair, and it was necessary to reconstruct it. The dam from 1853 down to this time had been kept in repair and maintained through the joint efforts of Mrs. Barnes and those who took under her and by the various people who owned the property on the west side of the creek. At that time the property now owned by defendant was owned by Magdalina Seitz, wife of Lucas Seitz, Sr. He lived with his wife on the premises, was in possession and had charge of them, and when plaintiff went out to work on this dam for the purpose of reconstructing it, Lucas Seitz, Sr., came up there and indicated his objections to plaintiff constructing the dam across the stream at that point, and said

he would like to have the westerly end located further south, so that the effect would be to send the water more directly to the raceway of plaintiff located in the east side of the creek, and prevent so large an overflow in times of high water on the lands located on the west side, then owned by Mrs. Seitz, and now owned by defendant. Plaintiff complied with that request and ran the dam diagonally across the stream; the easterly end being located at substantially the same point where the easterly end of the old sawmill dam was located, but the westerly end where it touched the Seitz lands being located further south. This change was made at the request of the then owner of the property on the west side of the creek, or by her husband who had charge and was in possession of it, and it was done exclusively for the benefit of those lands, and not for the benefit of plaintiff.

It must be understood that several years previously the old Huntington sawmill, located on the west side of the creek, and which had been operated for some years by his successors in title, had been abandoned, so that the owners of the property on the west side, defendant's predecessors in title, were not using any water power, and, when plaintiff found it necessary to reconstruct this dam so that he could operate his gristmill, Mrs. Seitz in no way contributed to the construction of the new dam, and took no part in it, excepting that her husband, for the benefit of those lands and to prevent their being overflowed, requested plaintiff to locate the westerly end further south than the old location, and that was done, and the dam has been continued in that location, and maintained exclusively by plaintiff openly and notoriously, and with the knowledge of the owners of the lands on the west side, and without objection, from that time until January 14, 1912, when defendant cut away portions of the dam to such an extent as to do away with its usefulness and to totally destroy plaintiff's water power privileges.

During all the years from 1853 down to the time defendant destroyed the dam, plaintiff's mill on the east side of the creek had been in operation, most of the time being run exclusively by the water which came through this raceway on the east side of the creek, the water coming from the pond created by the dam in question, and right down to the time defendant destroyed the dam this water power was utilized by plaintiff in the conduct of his milling business.

[1] From this somewhat lengthy recital of the facts established. on the trial, it is perfectly plain that plaintiff is the owner of a water privilege at the point in question, and has a right to maintain a dam across Allen's creek, and such rights have never been waived, surrendered, or abandoned. The mere fact that the deed of this gristmill property from Hannah Maria Barnes to the plaintiff, in 1881, does not in so many words speak of the water privileges, is of no particular importance, because the deed says that she transfers to plaintiff "all and singular, the tenements, hereditaments and appurtenances thereunto belonging or in any wise pertaining," and that would carry the water privileges, for they were appurtenances to the gristmill property; they were necessary to its use and would pass with the title as an in-

cident to it. 14 Cyc. pp. 1184, 1185; Hall v. Sterling Iron Co., 148 N. Y. 432, 42 N. E. 1056; Blake v. Clark, 6 Me. 436.

Moreover, long before defendant purchased his property, plaintiff had received from all of the heirs of his mother quitclaim deeds releasing any claims they could possibly have in this gristmill property and its appurtenances.

[2] I am satisfied that the conditions in the deed from Benjamin Huntington to Hannah Maria Barnes constituted an irrevocable easement. Mr. Huntington was the owner of the property, and he had a perfect right to burden it with a perpetual easement if he saw fit, and it was something more than a mere license. The water privileges referred to in the deed from Huntington to Mrs. Barnes constituted an easement, the deed was recorded, and neither he nor his successors in title could revoke it, and it would continue in full force unless it was waived, released, or abandoned by Mrs. Barnes or her successors in title, and that has never been done.

[3] Plaintiff's rights in this race and dam did not rest upon any parol license the result of conversations had with Lucas Seitz, Sr. The old deed from Huntington to Mrs. Barnes gave her and her successors in title an absolute right to construct and maintain the raceway on the east side of the creek, and to maintain and keep in repair a dam to furnish water power for her gristmill, and the precise location of that dam was not pointed out.

The dam and the raceway are necessary for the use of this gristmill. Those rights were conveyed to Mrs. Barnes by Mr. Huntington, and they have never been surrendered or abandoned, as heretofore stated. The mere fact that plaintiff changed the location of the westerly end of the dam at the request of the representative of the then owner of the property did not, and was not intended to, deprive plaintiff of his rights with reference to that dam, and a license cannot be spelled out of the transaction. Plaintiff had an absolute right to place that dam across the creek in the location as it existed at the time the deed of June 20, 1853, was made, and, if subsequently the west end of that dam was moved southerly at the request of the then owner of the adjacent property, plaintiff's rights were not surrendered. The whole transaction was for the benefit of those lands, and it was no benefit to the plaintiff, and the change of the location of the westerly end of the dam having been made for the reasons stated and at large expense to plaintiff, and it having remained in that location openly and notoriously and with the knowledge and acquiescence of the owners of the lands on the west side and without objection for a period of more than 25 years, and under claim of right adverse to the west side owner, it must be held that the facts establish a grant of an easement to have the dam located as plaintiff then constructed it. The whole transaction was based on a sufficient consideration; plaintiff changing the west end of the dam from the point where he had a right to place it, to a point southerly as requested by the representative of the then owner of the property, and it having been thus located for so many years without objection and openly, and with the knowledge and acquiescence of the west

side owners, the transaction was not only a grant of an easement, but it constituted also an easement by prescription to have the dam located as it was when defendant cut it down. Nicholls v. Wentworth, 100 N. Y. 455, 3 N. E. 482; 14 Cyc. pp. 1146–1148; Ward v. Warren, 82 N. Y. 265.

[4] Defendant exceeded his authority when he took the law into his own hands and destroyed plaintiff's valuable property rights. When he purchased his property of the Seitz heirs, the dam was in existence and could be seen by everybody. His deed, after describing the property, referred to a map on file in the Monroe county clerk's office, and this very dam is indicated on that map, so it is perfectly plain that defendant had knowledge of its existence before he purchased his property, and he was put upon his inquiry to ascertain what rights, if any, plaintiff had in this water privilege, and to have the west end of the dam abut against the property defendant was about to purchase.

Defendant's counsel, in his elaborate and very learned brief, urges that, after defendant had contracted for his property, plaintiff had interviews with defendant's immediate grantors, the Seitz family, with reference to a permit to construct a permanent concrete dam on the site as it then existed, urging that he would not have done this if he had not been conscious of the fact that he had no right to maintain the dam as then located. Plaintiff denies these various conversations; but, even if he had them as these witnesses in behalf of defendant testified, it would not be sufficient to establish the proposition that plaintiff knew he had no right to maintain the structure as then located.

It must not be forgotten that this dam was a party structure, owned and to be maintained by plaintiff, and by those owning the lands at its westerly end, and although those owners for a considerable time had done nothing toward its upkeep, and had not used the water for power for any mill purposes on the west side, still they had rights in those water privileges as well as plaintiff, and, when he desired to construct a permanent concrete dam on the site of the one defendant destroyed, it was quite the proper thing for him to consult those owning the property on the west side of the creek, and who had an equal interest with him in the dam and water privileges.

When defendant cut away this dam and destroyed plaintiff's water privileges, the manner in which he went about it would indicate that he acted hastily and more or less in the heat of passion. He seeks to justify this by claiming that plaintiff had placed some planks on the dam which raised the water considerably; but the evidence establishes that, even with this extra planking, it was not raised higher than the original dam, and plaintiff had a right under the deed of June 20, 1853, to raise it one foot.

The fact is, when defendant ascertained that plaintiff had put on these extra planks, without consulting him to ascertain why he did it, defendant on a Sunday obtained an axe and other convenient tools and cut openings in the dam so the water ran through, lowering the pond and effectually destroying plaintiff's water privileges. He had no right to thus arbitrarily destroy plaintiff's property, and it has been

established that he has suffered damages by reason of such destruction in the following amounts:

Loss of rental value of property from January 14, 1912, to trial of
  action ................................................................ $1,100 00
Cost of restoring race............................................... 50 00
Loss of electric light power......................................... 18 00
Cost of restoring dam................................................ 600 00
                                                                       _____
                                                                       $1,768 00

Upon all the facts as established in this case, it must be adjudged that on the 14th day of January, 1912, plaintiff was and at the present time is, entitled to maintain a dam across Allen's creek at a point where the dam was located at the time defendant destroyed it, and that it should be of a height equal to the height of the dam provided for in the deed from Benjamin Huntington to Hannah Maria Barnes dated June 20, 1853, and that plaintiff is entitled to damages against defendant occasioned by his cutting down said dam, in the sum of $1,768, together with a permanent injunction restraining defendant, his agents and servants, from interfering with plaintiff, his agents and servants, when he reconstructs said dam, and permanently restraining defendant, his agents and servants, from interfering with said dam after it shall be erected, together with costs to be taxed.

Findings may be submitted and judgment entered in accordance with these views.